Filed 12/14/22  In re P.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.L. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.A.,<br><br>Defendant and Appellant. | E079349<br><br>(Super.Ct.No. SWJ2000579)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge. Affirmed.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel and Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

In 2020, Mother appealed following a jurisdictional/dispositional hearing at which her three children, P.L. (age 4 at time of petition), E.L. (age 11 months), and G.A. (age 2), were placed with their non-custodial presumed father and the dependency was terminated, pursuant to Welfare and Institutions Code section 361.2.[1] The children came to the attention of the Riverside County Department of Public Social Services (Department) due to mother's failure to supervise the children, neglect of their medical, dental, and other needs, as well as her history of unresolved mental illness for which she did not take medication.

At the combined jurisdiction/disposition hearing, the court awarded father, who was deemed the presumed father of all the children, physical custody of the children and dismissed the dependency. Mother appealed, arguing the trial court erred in denying her oral motion to continue the disposition hearing pending the results of Live Scans of the other adults in father's home, and that the dispositional order awarding custody to father was in excess of the juvenile court's jurisdiction where it did not formally remove custody from mother. We concluded in the first appeal that the order placing the children with father was proper but that the juvenile court omitted to include findings to support removal if it intended to place the children with father pursuant to section 361.2 On remand, the trial court made the requisite findings.

Mother appeals a second time claiming she was denied her due process right to a disposition hearing on remand. We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

## BACKGROUND

We recite the background facts from our opinion in the first appeal, *In re P.L., et al.,* E076969, filed on February 15, 2022 (typed opn., pp. 3-13), and supplement it with current information:

P.L., then age 4, E.L. then age 10 months, and G.A., age 2, came to the attention of the Department on October 16, 2020, when the maternal grandmother, with whom G.A. had been living, asked mother to pick up the child. Mother declined because she was then living out of state in a toxic relationship and had outstanding warrants. Mother and maternal grandmother had a mutual agreement because G.A. was the product of a rape of mother by a man unknown to mother except by his first name, so G.A. had lived with the maternal grandmother. A few days later after the first call, maternal grandmother made a second request for mother to pick up G.A., and this time, mother picked him up. During the time maternal grandmother had care of G.A., she had neglected his medical and dental needs, and had thrown a phone at him hitting him in the mouth, hurting his lip, broken some of his teeth, and bent his finger before requesting that mother take him.

After receiving the referral, a social worker made an unannounced visit. Mother was uncooperative insisting her children were fine, but the circumstances apparent to the social worker were concerning: G.A. had rotten teeth, was dirty and wearing a wet diaper; P.L. was also dirty, and, when the social worker arrived, the children were playing in a driveway on a busy street, unsupervised.

3

The living arrangements in the household were not ideal. P.L. slept in the bedroom with mother and her boyfriend, M.D., with the door locked, while E.L. slept in a playpen in the living room, where J.A., mother's 16-year-old developmentally delayed, malnourished brother (the maternal uncle, who had also been abused and neglected by the maternal grandmother) supervised him. In the house, there was alcohol that was accessible to the children, but no formula for E.L., because mother had decided he should eat a regular diet, and the home was unkempt. Mother allowed her brother to care for E.L., and, in the social worker's presence, M.D. attempted to feed E.L. a bottle of V-8 juice, while the child lay on his back causing the child to choke. The social worker showed the boyfriend how to properly feed the baby.

Mother made inconsistent statements regarding the progeny of G.A., first stating he was the product of rape, but also stating that A.L., the father of the other children, must be his father. Mother also described what an unfit custodian the maternal grandmother was, but when asked why she left G.A. in the care of such an unfit person, mother explained she gave G.A. to the maternal grandmother to raise to give her a second chance to do a better job raising him than the grandmother did with mother and her brother. Due to mother's irrational decisions, the social worker offered mother informal services, but mother declined, protesting that she was a good parent. Child welfare history supported the social worker's concern where mother had a lengthy history of referrals for neglect, severe neglect and abuse as a minor.

4

Nevertheless, the decision was made to file an out-of-custody petition, pursuant to section 300, subdivision (b)(1), based on mother's failure to supervise the children or provide adequate food, her unresolved mental health issues for which she was not taking medication, her lack of parenting skills in allowing the children to play unsupervised in a driveway near a busy street, and that father, who was not a member of the household, failed to protect.

The decision to remove the children was based on subsequent events leading to a referral on November 19, 2020. The referral indicated mother was supposed to drop off P.L. and E.L. with their father in Reno, Nevada, but instead, she took G.A. to Reno, and left him alone in the street at 3:00 a.m., as mother and her boyfriend drove off. The maternal grandmother reported that mother had taken G.A. to the dentist, but abruptly took him out of the dentist's office, with bloody mouth and bruises, drove him to Reno without a car seat, and left the child, barefooted, in the street, without clothes or medication. Mother and father had an argument when she arrived, with mother reporting that father punched her in the face, although no marks were visible when the social worker interviewed her later that day. On the way back to California, mother had been in a car accident. Maternal grandmother reported that mother left the baby, E.L., alone with his minor uncle, so she contacted law enforcement to conduct a welfare check. Subsequent contact with father revealed that P.L. was also in the car when mother arrived in Reno.

When asked why she took G.A. to stay with father A.L., when mother had claimed he was not G.A.'s father, mother now contended A.L. must be G.A.'s father. Regarding the wisdom of leaving E.L. alone with J.A. while she went to Reno, mother denied leaving them at the residence, asserting they were in the car when she left G.A. with father A.L., and that after she returned to California, she had dropped J.A. and E.L. off at their residence and left to buy groceries. However, J.A. earlier had informed the social worker that mother was not home because she was visiting a friend in the hospital. And father later confirmed that E.L. was not in the car when mother left G.A. in the street. This meant mother had left E.L. with his developmentally delayed teenaged uncle, despite her denial.

The social worker's investigation led to contact with the dentist's office where she learned the dentist had recommended capping the child's teeth. Mother insisted he pull the teeth because she "was getting rid of the child and putting him up for adoption." This, and her "disconnect" with G.A., left an impression on the personnel at the dental office. The dental office also noted that mother appeared to lack common sense respecting supervision or nurturing of children. Meanwhile, mother complained about being harassed by the social services agency, despite the fact she had gotten rid of G.A.

On November 30, 2020, a welfare check was made on G.A. while in father's care in Reno, finding him to be in good health. Father's home was described as appropriate, and law enforcement indicated there were no concerns about it. Father A.L., had not submitted to DNA testing, but he believed G.A. to be his own child due to a resemblance.

6

On December 9, 2020, another social worker observed mother in a heated argument with two women, and, while so distracted, P.L. walked past her and out the front door, requiring the social worker to intervene. That same day, mother left a voice mail message for the social worker ranting against the social services agency. Due to concerns about mother's ability to supervise and the parents' volatile relationship the department decided to place the children in protective custody.

On December 15, 2020, the department filed a first amended petition, realleging the previous jurisdictional facts, but adding G.A. and an allegation that the parents engage in domestic violence in the children's presence. In the detention report, DPSS recommended detaining all three children, for whom a protective custody warrant had been issued on December 10, 2020.[2] When informed of the recommendation by the Department, mother launched a verbal attack, yelling obscenities in front of the children and telling the social worker she hoped the worker either choked on V-8 juice or was killed in an accident. P.L. and E.L. were placed in a foster home, and, on December 13, 2020, G.A. was placed in protective custody when father brought him back to Riverside County and surrendered G.A. to the department for placement.

On December 16, 2020, the court conducted the detention hearing. A.L. was declared the presumed father of P.L. and E.L., but the court reserved ruling as to G.A. The court found a prima facie showing had been made that all three children came within section 300, and that the risk of substantial danger to the children required their removal

---

[2] The protective custody warrant is not in the record.

from the parents' care. The court authorized paternity testing of father respecting paternity of G.A., and also authorized an extended visit for father with the children pending the next hearing if his home could be assessed. Although the father was not declared a presumed father of G.A. at this time, the court found he was a non-relative extended family member (NREFM) with respect to G.A. pending the results of the paternity testing. At the hearing, father executed a Statement of Parentage (JV-505) as to all three children.

The report for the jurisdiction/disposition hearing was filed on January 5, 2021. It included prior child welfare contacts involving the parents, comprising several unsubstantiated reports of neglect, medical neglect and domestic violence resulting in closed investigations.[3] The report also noted that father had submitted to paternity testing. Regarding the allegations of the petition that father failed to protect or provide for the children, father indicated he did support the children when they lived in Reno until mother left. However, after mother left to return to California, she "blocked" him from contacting her. He tried to contact her through social media sites and asked friends to text her. He finally heard from her after four months, when she texted him about dropping off G.A. Regarding the allegation of domestic violence, father admitted to verbal arguments, but nothing physical. The department recommended that the court find the allegations of the petition true, adjudge the children as dependents, make findings

---

[3] In this report, some of the prior contacts in Washoe County, Nevada, refer to a child named Is., age 4, who is not a party to the instant proceedings.

pursuant to section 361, and remove custody of the children from the parents with the provision of reunification services.

On January 8, 2021, the matter was called for the jurisdiction hearing, at which time the matter was set as a contested hearing. The court directed the Department to investigate whether an extended visit for father and G.A. was appropriate and authorized an extended visit for father as to all children as soon as the department approved the status of all adults residing in father's home.[4]

On February 22, 2021, the Department submitted an addendum report with the same recommendations, but with an added request that a psychological evaluation be ordered for mother and a request to authorize father's home for placement of the children with him in Nevada. By way of additional information, the Department reported that mother had declined referrals for services, although she did indicate she was enrolled in counseling. Later she signed the case plan and agreed to participate in all services except anger management, because she did not need it. She also signed up for parenting classes and anger management classes. At the Child and Family Team meeting held on January 28, 2021, the Department indicated it intended to follow the "path of presumed father," and would continue to assess for extended visits for father. It was also agreed that mother would not excessively call the caregivers outside the scheduled time.

The report also included information about visits and efforts to complete an assessment of father's residence in Reno, Nevada for an extended visit. A courtesy home

_____

[4] At the time of the proceedings, father was living with the paternal grandmother.

9

visit had been conducted on father's home by Washoe County social services, and found the home is appropriate with no safety concerns. Additionally, the paternal grandmother, her boyfriend, and an adult male, who lived in the household, denied any criminal history.

During the interim, mother's visits with the children reflected continued poor judgment: she was observed putting G.A. in time out without giving him permission to get up from his isolation chair, leaving him there for a longer period than was appropriate for his age. She also spanked P.L during the visit. When the incidents were discussed with mother, she informed the social worker that she had learned she had a right to physically discipline her children from the parenting education classes.

The father had consistent video calls with the children and there were no concerns, although he reported that mother excessively called the paternal grandmother and himself.

On February 25, 2020, the matter was scheduled for the jurisdiction/disposition hearing. However, the Department made a motion to file a second amended petition. The amendment added an allegation pursuant to section 300, subdivision (g), that the whereabouts and identity of the father of G.A. were unknown and that he failed to provide for G.A. The Department requested a continuance in order to obtained out-of-state criminal records information respecting father's "roommates" and asked that the court leave in place the authorization for extended visits for father with all three children. Father proffered stipulated testimony going to the issue of his being the presumed father

of G. A., which the court accepted. According to his testimony, between January and June of 2020, G.A. went back and forth between father's home and mother's home, staying four weeks to a month at a time. He holds G.A. out as his son and considers him part of his family. He has provided toys, clothes, diapers, wipes, and everything a child needs when G.A. has been in his care, and he is willing and able to have G.A. placed in his care, along with his siblings.

The court found father was the presumed father of G.A. and signed a formal order of parentage. The matter was continued for background checks of father's roommates. Mother argued against father being declared presumed father of G.A. and objected to the extended visits for the children with father.

On March 24, 2021, the Department submitted another addendum report, again recommending true findings on the petition, but this time it recommended placement with father, an award of physical custody to him, and termination of the dependency upon the filing of the custody orders.

The recommendations were based on the following additional information: Father's in person visits with the children had gone well, although mother had behaved aggressively toward him by blocking him in the parking lot of a Walmart store. On February 25, 2021, the department was informed that the Investigative Criminal Report team had processed documents to initiate background checks for paternal grandmother, her fiancé and the adult roommate. No criminal contacts were found in California, and no FBI numbers were located, required to run an FBI report. Because all three members

11

of father's household resided out of state, the Department requested that they be referred for Live Scan.

On March 11, 2021, the report indicated that Nevada was able to do the Live Scans, but the results would take a long time. The social worker informed father that until Live Scan clearances of the paternal grandmother and the other occupants of the household were received, the children could not be left unsupervised with the paternal grandmother, her fiancé and the other adult male. Father agreed to abide by this directive.

On March 18, 2021, mother's therapist informed the social worker that mother could use additional in-home help with the children, and that mother had been verbally combative during sessions, needing to be redirected.

On March 20, 2021, father picked up the children (with a vehicle adequately furnished with car seats) to begin his extended visit. When the social worker contacted the father on March 22, 2021, the children were doing well. The Department recommended that the children remain in father's care pending family law orders.

On March 29, 2021, the court completed the jurisdiction/disposition hearing. Mother requested custody be awarded solely to her, "or at least wait for continuance [*sic*] to wait for Live Scan results." The court did not rule on the request, but after admitting the reports into evidence and considering them, the court struck the allegations regarding father's failure to protect the children, as well as the allegation under section 300,

12

subdivision (g) regarding G.A.'s father, in light of the court's determination that father A.L. was the presumed father of G.A.[5]

The court then found that the noncustodial father was not residing with the children when the events or conditions arose that brought the children with the provisions of section 300, he desires custody, and that placement with the noncustodial father will not be detrimental to the children. The court therefore adopted the findings recommended in the report, awarded custody of the children to the noncustodial father, found that services were not needed, and granted mother reasonable visitation, to be supervised, over mother's objection to supervision.

On April 29, 2021, mother appealed. On February 15, 2022, we affirmed the order denying the continuance but remanded the matter for findings to support the disposition order because we could not tell if the court intended to award custody to a non-offending parent pursuant to section 361, subdivision (c)(1)(B), or if it intended to remove custody to place with the noncustodial parent.

On remand, mother made a request for a new disposition hearing, which the juvenile court denied. The court then made findings pursuant to section 361, subdivision (c)(1)(A), as required by our directions, and affirmed the Family Law exit orders previously made.

---

[5] After making these findings, the court also found that the child E.L was a person described under section 300, subdivision (g), but this appears to be inadvertent, because at no time had the petition alleged he was such a person.

13

On appeal, mother argues her due process rights to a disposition hearing were denied when the juvenile court refused to reconsider the issue of removal of custody on remand. The Department argues that the trial court lacked authority on remand to make any orders other than those directed by us to make in our disposition of the prior appeal. We agree with the Department.

A reviewing court "may affirm, reverse or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had." (Code Civ. Proc., §§ 43, 906.) "The order of the reviewing court is contained in its remittitur, which defines the scope of the jurisdiction of the court to which the matter is returned." (*In re Anna S*. (2010) 180 Cal.App.4th 1489, 1499, citing *In re Francisco W*. (2006) 139 Cal.App.4th 695, 704–705; *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701; *Hampton v. Superior Court* (1952) 38 Cal.2d 652, 656.)

"After the remittitur 'the appellate court has no further jurisdiction of the appeal or of the proceedings thereon, and all orders necessary to carry the judgment into effect shall be made by the court to which the certificate is remitted.' [Citation.] Thus, the trial court is revested with jurisdiction of the case, but only to carry out the judgment as ordered by the appellate court. The same is true in civil cases. [Citations.]" (*People v. Dutra* (2006) 145 Cal.App.4th 1359, 1366, italics omitted (*Dutra*).)

14

In other words, the terms of the remittitur define the trial court's jurisdiction to act. (*Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 774, fn. 5, citing *Hampton v. Superior Court* (1952) 38 Cal.2d 652, 655-656.) The trial court is bound to follow the remittitur whether it believes the appellate court's decision is right or wrong, or has been impaired by subsequent decisions. (*Dutra, supra*, 145 Cal.App.4th at p. 1367.) "'''The lower court cannot reopen the case on the facts, allow the filing of amended or supplemental pleadings, nor retry the case, and if it should do so, the judgment rendered thereon would be void.'''" [Citations.]" (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701; see also, 9 Witkin, Cal. Proc.(5th ed. 2022) Appeal § 908.)

In the present case, we agreed the decision to place the children with the father was amply supported by the record. That decision had been made at the dispositional hearing, conducted with notice to mother and an opportunity to be heard. Having availed herself of the opportunity to be heard at the dispositional hearing, mother was not entitled to a new hearing absent an unqualified reversal of that judgment.

Our opinion was not an unqualified reversal of the judgment, but, instead, held only that the record did not include the trial court's findings of whether it was placing the children with father pursuant to section 361, subdivision (c)(1)(B), or whether it intended to place the children with him pursuant to section 361.2. In either situation, as we pointed out, the court was required by section 361, subdivision (c), to state the basis for its decision. We remanded the matter to the juvenile court solely for that clarification,

15

and for inclusion of the requisite findings, not for a new disposition hearing at which the court would reconsider the placement issue. The trial court did so, following our directions on remand. The court lacked authority to do anything except to state its findings on the record as required by our disposition order on appeal. Mother was neither entitled to nor deprived of another disposition hearing or reconsideration of the placement issue.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____

P. J.

We concur:

MILLER_____

J.

SLOUGH_____

J.